UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-80764-CIV-MARRA

STOCK FRAUD PREVENTION, INC.,

Plaintiff,

vs.

STOCK NEWS INFO, LLC, SKYLINE
INVESTMENTS, INC., STEVEN KOIFMAN,
and SCOTT WILDING,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendants Stock News Info, LLC and Steven Koifman's ("the Koifman Defendants") Notice of Motion to Dismiss the First Amended Complaint with Prejudice (DE 17).  The Court has carefully considered the motion and is otherwise fully advised in the premises.

I.  Background

Plaintiff Stock Fraud Prevention, Inc. ("Plaintiff") brings this First Amended Complaint (DE 14) against Defendants Stock News Info, LLC ("Stock News"), Skyline Investments, Inc. ("Skyline"), Steven Koifman ("Koifman") and Scott Wilding ("Wilding") (collectively, "Defendants") for breach of contract against all Defendants (count one), unjust enrichment against all Defendants (count two) and money had and received against Skyline and Stock News (count three).

According to the allegations of the First Amended Complaint, Plaintiff is a Wyoming corporation whose predecessors-in-interest Cylogic Aerospace ("Cylogic"), a Nevada

corporation, and Crown Marketing ("Crown"), a Wyoming corporation, have assigned their rights against Defendants to Plaintiff. (First Am. Compl. ¶¶ 1, 7.) Cylogic and Crown are entities which dealt directly with Defendants. (Id. at ¶ 7.) There are various third-party beneficiaries of the contract between Cylogic and Crown and Defendants, which are all either incorporated or have their principal place of business outside the United States or outside the state of Florida. (Id. at 8.) Plaintiff was incorporated solely for the purpose of asserting Cylogic, Crown and the third-party beneficiaries' rights against Defendants.[1] Cylogic and Crown are each owners of one-half the shares of Plaintiff and they assigned their claims to Plaintiff upon its incorporation. (Id. at ¶ 10.) The third-party beneficiaries have also assigned their rights against Defendants to Plaintiff. (Id. at ¶ 11.)

Cylogic and Crown sold an aggregate of 3,000,000 shares of CUBV common stock ("shares"), approximately 78% of their holdings, to Defendants. (Id. at ¶ 14.) The consideration for this purchase was $50,000. The purchase price was to be paid by Defendants Skyline and Stock News via four promissory notes due on March 4, 2011, bearing interest in the amount of 4% per annum. Defendants also promised to launch, fund and manage a public relations campaign aimed at increasing awareness of company operations for the purposes of drawing attention to the company as an investment opportunity. Defendants also represented that they would find buyers for the 15 million shares held by the third-party beneficiaries at prices considered satisfactory to the third-party plaintiffs. (Id. at ¶ 15; Stock Purchase Agreements,

---

[1] At times, throughout the First Amended Complaint, Plaintiff refers to Cylogic and Crown as the "selling Plaintiffs" and the third-party beneficiaries as "third-party plaintiffs." "Plaintiffs" is used as a collective term for these entities. (Id. at ¶ 12.) The Court will do the same.

Exs. C, D, F, DE 14-3, 14-4, 14-6; Promissory Notes, Exs. A-B, E, G, DE 14-1, 14-2, 14-5, 14-7.)

At a January 20, 2011 meeting, Wilding indicated that he had authority to engage Koifman and Stock News into a binding contract as Koifman would be working closely with Wilding and, at Wilding's behest, managing the promotional campaign. (Id. at ¶ 17.) Wilding promised, on behalf of Koifman, Skyline and Stock News, that Defendants would not knowingly take any action that would likely have a significant adverse effect on the trading price of CUBV shares. Defendants knew that "penny stocks," such as CUBV, tend to have limited trading volume and that the share price can be unstable in the early years of being publicly traded. Defendants promised to limit their sales of the shares and agreed to a formal "lock-up" provision. (Id. at ¶ 18.)

The lock-up provision consisted of two independent commitments. First, Defendants promised not to sell shares in an amount that exceeded one-fourth (25%) of the total actual trading volume of CUBV shares on any given day. Second, Wilding promised, on behalf of all Defendants, to reinvest eighty percent (80%) of the income generated from the sale of shares into the promised promotional campaign detailed above. (Id. at 19.) The individual defendants assured Plaintiffs that they would personally oversee the public relations campaign and the sale of the third-party Plaintiffs' stock. (Id. at 20.) Plaintiffs did not believe they were dealing directly with the corporate defendants, but rather that they were in privity with Wilding and Kaufman to whom the corporate defendants were entirely subservient. (Id. at ¶ 21.)

At the time the agreements were entered into, CUBV common shares were trading in the range of $0.37 per share. Cylogic and Crown agreed to sell, and Defendants agreed to buy, the

3

shares for a discounted purchase price that would be tendered via a promissory note, in conjunction with the promise by Defendants to provide the public relations campaign. (Id. at ¶ 22.) Defendants estimated the cost of the campaign to be $800,000. The selling Plaintiffs agreed that the individual defendants would be permitted to reimburse themselves for costs advanced via a sale of the shares and obtain payment for their management services, as long as they did not breach the lock-up provision. (Id. at ¶ 23.)

The promissory notes exchanged as partial consideration for the sale of the 3,000,000 shares represent a heavily discounted purchase price of $50,000 that would be supplemented by the provision of services equal in value to $1,060,000 - $800,000 in anticipated expenses related to the promotional campaign and $260,000 in management and consulting fees paid to Defendants- for a total value of $1,110,000, or $0.37 per share. This would represent an exchange of cash and services roughly equivalent to the market value of the shares at the time, as indicated by the price at which they were then trading on a public exchange. (Id. at ¶ 24; Exs. A-H, DE 14.) Defendants' management fee for the public relations campaign was estimated to be 16% of the total campaign costs. (Id. at ¶ 26.)

Wilding agreed to allow Adam Hand, an agent for Cylogic and Crown, to periodically review Defendants' trading accounts to ensure that the 1 to 4 sales ratio was being honored (Id. at ¶¶ 16, 29.) The individual defendants knew they were receiving a discounted purchase price in exchange for their promise to invest in and manage a public relations campaign on behalf of the Company and its shareholders. (Id. at ¶ 31.) Defendants, however, made no effort to launch a sustained public relations campaign on behalf of the Company and its investors. Instead, Defendants sold the bulk of their shares as quickly as possible, and then stopped responding to

4

the selling Plaintiffs' inquiries and ceased all contact. The stock price dropped precipitously during this time. (Id. at ¶ 32.)

On or around March 14, just 8 days after the shares were transferred to Defendants' accounts, CUBV shares began trading in significant volumes. On April 5, trading was up from virtually nothing to 800,000 shares in a day.  Later in that week, the sales volume of CUBV shares rose to 5 million shares in a single day, with two additional days in that week registering trading volume between 1 and 2 million shares per day. (Id. at ¶ 33.)  After conferring with all of the largest stakeholders, the only ones who would have owned enough shares to trigger such a selloff, and reviewing their trading accounts, it became apparent to Cylogic and Crown that Defendants were the prime suspects in triggering the selloff. (Id. at ¶ 35.)  Wilding refused to grant Hand access to his trading accounts despite his promises that he would do so at the January 20 meeting. (Id. at 36.)

"On information and belief" Defendants were primarily responsible for the sell-off that crushed the share price from $0.37/share to $0.08/share in less than one week. (Id. at ¶ 37.)  "On information and belief," Wilding, Koifman, Stock News and Skyline sold heavily at this time, even though no expenditures had yet been made towards a public relations campaign. (Id. at ¶ 38.)  Virtually none of the proceeds of the sale of CUBV shares was devoted to the promised promotional campaign, despite the fact that Plaintiffs claim Defendants generated income in the range of $700,000 to $900,000 between them from the sale of CUPV shares. (Id. at ¶ 39; Disclosure from hotstocked.com Ex. I, DE 14.)

The individual defendants claimed that the sales of CUBV shares were being made by "short sellers" and not by them. Around the same time, Wilding sent to Plaintiffs photographs of

himself at Prestige Imports, the Lamborghini dealership in Miami. (Id. at ¶ 41.)  In mid-April of 2011, Hand, on behalf of selling Plaintiffs, asked Wilding to prove that he had not breached the investment contract by selling shares in an unauthorized manner. Hand suggested that Wilding prove his compliance with the lock-up provision by presenting business records from trading accounts to confirm that Skyline and Stock News had not sold a single share, as was his claim at the time. Wilding replied that he would not provide such documents absent a subpoena. (Id. at ¶ 43.)  According to Yahoo Financials, the price of CUBV shares sank from $0.29/share on April 4 to $0.07/share on April 8, based on millions of shares of trading activity. (Id. at ¶ 46.)

Cylogic and Crown lost the difference between the market value of the CUBV shares and the price at the time they sold the discounted shares to Defendants. Plaintiffs claim damages arising from this fraudulently induced discount amount is $1,062,000. (Id. at ¶ 48.)  The selling Plaintiffs were further injured when the market value of their remaining shares dropped precipitously as a direct consequence of Defendants' selling activity in contravention of the promises made at the time shares were originally purchased from the selling Plaintiffs. (Id. at ¶ 49.)  Defendants were unjustly enriched when they sold the shares into the market, reaping illicit gains in an amount approximating $900,000. Defendants were further enriched when Defendants failed to repay the $50,000 debt embodied in the promissory notes, in addition to interest accrued thereon. (Id. at ¶ 50).

The Koifman Defendants move to dismiss pursuant Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  These Defendants contend that Plaintiff has not established standing to assert any claim because all of Plaintiff's claims are by "purported assignment" and there is no indication that "any claim has been actually and validly assigned to Plaintiff." (Mot. at

11.) With respect to the breach of contract claim, they argue: (1) the alleged promises were made contemporaneously with but are not mentioned in the Agreements, thus those alleged promises are nullified under the parol evidence rule; (2) they made none of these promises and (3) Plaintiff improperly asserts this claim against a non-party to the contract (i.e., Koifman) and on behalf of purported third-party beneficiaries that are not mentioned in the Agreements. (Mot. at 14-20.) Next, with respect to the unjust enrichment claim, the Koifman Defendants state that the First Amended Complaint does not allege that they ever sold any shares. Instead, the First Amended Complaint alleges that Wilding sold shares, incurred personal benefits, and was primarily responsible for the alleged sell-off. (Mot. at 20.) Lastly, regarding the claim for money had and received, Stock News asserts that it never received or possessed any of Plaintiff's money. (Mot. at 21.)

II. Legal Standard

Where a motion to dismiss is made on the basis of lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, subject matter jurisdiction may be attacked either facially or factually. See McElmurray v. Consolidated Gov't of Augusta–Richmond County, 501 F.3d 1244, 1251 (11th Cir. 2007). As the Eleventh Circuit explained in Lawrence v. Dunbar, 919 F.2d 1525, 1528–29 (11th Cir. 1990):

> 'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.' 'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'
>
> These two forms of attack differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion - the court must

>consider the allegations of the complaint to be true. But when the attack is factual, the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction - its very power to hear the case - there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Id. at 1528–29 (citations omitted).

With respect to the motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court observes first that Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a

plaintiff has stated a claim for which relief could be granted. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

III. Discussion[2]

A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Koifman Defendants challenge Plaintiff's standing to bring this action. Specifically, they assert that Plaintiff's bald allegations of assignment are insufficient. For example, the Koifman Defendants note that while the First Amended Complaint states that Cylogic is a Nevada Corporation, the Nevada Secretary of State records show Cylogic's corporate charter was revoked on May 26, 2006. (Nevada record, Ex. A, DE 17.)  Thus, according to the Koifman Defendants, because Cylogic does not exist and cannot transact business after May 26, 2006, "the existence of Plaintiff is dubious." (Mot. at 11; Reply at 6-7.)  Moreover, the Koifman Defendants point to a August 17, 2010 letter from attorney Jonathan M. Shiff to Standard Registrar & Transfer Co. Inc., which lists both Cylogic and Crown at the same address in Panama City, Panama.  The letter states for both entities "No Tax Id (Non-U.S.)" and states the shares for Cylogic and Crown were to be issued in the name of Arakis Financial, Inc. (August 17, 2010 letter, Ex. H, DE 14-8.)   In response, Plaintiff has attached an assignment by the Selling Plaintiffs and the Third Party Plaintiffs to Plaintiff, dated June 27, 2011. (Assignment, Ex. A, DE 21-1.)

To the extent, the Koifman Defendants seek a ruling that Plaintiff lacks standing because

---

[2] In a diversity case, the Court applies Florida law. See Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1132-33 (11th Cir. 2010); Royal Ins. Co. of America v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir. 2001).

its existence is "dubious," the Court rejects this claim. It appears that the issue presented is whether the assignment is valid in view of the revocation of Cylogic's corporate charter prior to the assignment. Notably, the Koifman Defendants are not challenging the assignment by any other entity other than Cylogic. Thus, assuming arguendo that Cylogic's assignment was invalid, would that render the entire assignment invalid?

Section 336 of the Restatement of Contracts titled "Defenses against an Assignee" states, in pertinent part, that, "By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity." Restatement (Second) of Contracts § 336 (1981). Furthermore, "[u]nlike the negotiation of a negotiable instrument, the assignment of a non-negotiable contractual right ordinarily transfers what the assignor has but only what he has." Id, cmt. b.

At this point in the proceeding, based on the evidence before the Court, the Court is not able to conclude that the assignment, in its entirety, is defective, given that there is no challenge to any other entity's assignment to Plaintiff. At the very least, Plaintiff has whatever rights were assigned by those other entities. Moreover, with respect to Cylogic's ability to assign its rights, "a contract executed in the name of a dissolved corporation may be enforceable when the contracting party entered the contract without knowledge of the dissolution or the contracting party would not be prejudiced by enforcement." 16A William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 8118 (rev. ed. 2011) citing Automatic Sprinkler Co. of Am. v. Star Clothing Mfg. Co., 267 S.W. 888 (Mo. 1924) ("[m]echanic's lien was enforceable

for balance due for installation in the corporation's building of a sprinkler system contracted for by the sole officer and stockholder of such corporation after the corporation's charter had expired by operation of law but before either of the contracting parties had actual knowledge of the expiration thereof") and Alexson v. Steward, 203 P. 423 (Cal. Dist. Ct. App. 1921) ("sole stockholder of corporation which has forfeited its charter was entitled to enforce a contract made by him in its name after such forfeiture, where the rights of the other party, who believed that he was contracting with the corporation, were in no matter prejudiced").  Thus, given this record, the Court cannot determine the validity of the assignment to Plaintiff. As such, the Koifman Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

    B.  Motion to Dismiss for Failure to State a Claim

    1.  Breach of Contract claim

The Koifman Defendants move to dismiss Plaintiff's breach of contract claim on the basis that (1) the parol evidence rule bars consideration by the Court of the alleged promises that were allegedly breached; (2) Koifman is not a party to the contract or attendant promissory notes and (3) the Third Party Plaintiffs are not mentioned in the Agreements.  Plaintiff responds that, absent a merger clause, the parol evidence rule cannot be applied to bar contemporaneous oral promises and the question of integration is a factual one.  Plaintiff also responds that, as third-party beneficiaries, third-party plaintiffs may seek to enforce the contract.

Where a contract's terms are "clear and unambiguous, the 'language itself is the best evidence of the parties' intent and its plain meaning controls. . . .' " Pearson v. Caterpillar Fin. Servs. Corp., 60 So. 3d 1168, 1171 (Fla. Dist. Ct. App. 2011) (quoting Fecteau v. Se. Bank, N.A., 585 So.2d 1005, 1007 (Fla. Dist. Ct. App.1991)). Where provisions of a contract are

ambiguous and unclear on the face of the agreement, courts may consider evidence outside of the plain language for the purpose of determining the intent of the parties at the time of formation of the contract at issue. Gulf Cities Gas Corp. v. Tangelo Park Serv. Co., 253 So.2d 744, 748 (Fla. Dist. Ct. App. 1971). Both the interpretation of a contract and whether an ambiguity exists are questions of law. Wheeler v. Wheeler, Erwin & Fountain, P.A., 964 So. 2d 745, 749 (Fla. Dist. Ct. App. 2007). Resort to parol evidence is permissible where there is a latent ambiguity; i.e., "where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Syverson v. Jones, 10 So. 3d 1123, 1125 (Fla. Dist. Ct. App. 2009) (quoting Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So.2d 544, 547 (Fla. Dist. Ct. App. 1973)).

"Evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1309 (11th Cir. 1998) (citing Chase Manhattan Bank v. Rood, 698 F.2d 435, 436 (11th Cir.1983)); see also Allett v. Hill, 422 So. 2d 1047, 1050 (Fla. Dist. Ct. App. 1982) (finding error in "the admission of parol evidence to add a term to the written lease . . . whether part of the preliminary negotiations or a separate subsequent condition")

Here, the stock purchase agreement reflects the sale of shares by Crown and Cylogic to Stock News for promissory notes. (Stock Purchase Agreement, Ex. F; Promissory Notes, Exs. A, G.) Based on the Court's review of the contract, there is no ambiguity. It clearly states the number of shares conveyed, the purchase price and the form of payment. Nothing in the stock

purchase agreement mentions a lock-up provision, personal services to be performed by Defendants or any other consideration besides the promissory notes.

Nonetheless, Plaintiff claims that allowing parol evidence is appropriate because the most reasonable inference is that the stock purchase agreement represents one subpart of a larger agreement because otherwise the Selling Plaintiffs "essentially gave away the shares." In making this argument, Plaintiff contends the agreement lacks a merger clause, thus demonstrating that the parties did not intend for the stock purchase agreement to be the final and complete agreement. (Resp. at 12.)

The Court disagrees. First, the stock purchase agreement appears complete on its face. See Gulf Atlantic Towing Corp. v. Dickerson, Inc., 271 F.2d 542, 546 (5th Cir. 1959) (for the parol evidence rule to apply the written agreement must appear on its face "to express an agreement complete in all essential terms");[3] 11 Richard A. Lord, Williston on Contracts, § 33:16 (4th ed. 2011 ) ("[i]t is generally held that the contract must appear on its fact to be incomplete in order to permit parol evidence of additional terms'). Second, Florida law is clear that "when a legal act is reduced into a single writing, all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act, the instrument itself being regarded as the best evidence of what the parties intended. No other language is admissible to show what they meant or intended." Smith Engineering & Construction Co. v. United States Fidelity and Guaranty Co., 199 So. 2d 302, 305 (Fla. Dist. Ct. App. 1967). Thus,

---

[3] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

the Court does not accept Plaintiff's contention that it must infer the written agreement is not the complete agreement. Id. ("when parties deliberately put their agreement into writing in such terms as import a legal obligation . . . it is conclusively presumed that the whole engagement and the extent and manner of their undertaking is contained in the writing.") Lastly, the Court rejects Plaintiff's argument that the question of integration and therefore the applicability of parol evidence is factual.[4]

Next, the Court addresses Defendant Koifman's argument that no breach of contract claim can proceed against him individually when he was not a party to the contract and promissory notes. A review of the First Amended Complaint does not reveal any allegations which would permit the piercing of the corporate veil. See Doe v. Thompson, 620 So.2d 1004, 1006 (Fla. 1993) ("acts of corporate employee performed in corporate capacity do not form the basis for jurisdiction over corporate employee in individual capacity"); Ryan v. Wren, 413 So.2d 1223, 1224 (Fla. Dist .Ct. App.1982) (an officer of a corporation cannot be held liable on a contract "in his individual capacity unless he either signed the contract in his individual capacity or unless the corporate veil was pierced or the corporate entity should be ignored because it was found to be formed or used for fraudulent purposes or where the corporation was merely the alter ego of the shareholder."). In other words, there are no allegations suggesting Koifman's acts were outside his corporate duties as opposed to being taken on behalf of Stock News. For that

---

[4] In support, Plaintiff cites Wade v. N.G. Wade Inv. Co., 802 So. 2d 1200, 1200 (Fla. Dist. Ct. App. 2002). That case merely reversed the trial court's granting of summary judgment on the basis that it was unable to determine from the face of the agreement whether it was an integrated contract "without indulging in at least one inference in favor of appellee." Id. It does not stand for the proposition that the question of integration is always a factual question to be decided at trial, as suggested by Plaintiff. (Resp. at 12.)

reason, the breach of contract claim is dismissed against Defendant Koifman.

Finally, the Court agrees with the Koifman Defendants that Plaintiff may only sue on behalf those entities who are mentioned, in some manner, in the agreements. The stock purchase agreement does not reference the parties Plaintiff claims are third-party beneficiaries. Although Plaintiff asserts that the lock-up provision was intended to benefit the Third-Party Plaintiffs, the Court has rejected Plaintiff's attempt to rely on parol evidence to show that the lock-up provision was part of the parties' agreement.

In sum, the breach of contract claim, as memorialized in the stock purchase agreement and the promissory notes, may proceed against Stock News. To the extent Plaintiff seeks to advance any other relief in this claim, it is precluded.[5]

  2. Unjust Enrichment claim

In moving to dismiss the unjust enrichment claim, the Koifman Defendants state that there are no allegations that they ever sold shares or retained any benefit "consequent to inequitable or unlawful conduct," whereas there are "express allegations that Wilding sold shares, incurred personal benefits (i.e., Wilding's purchase of a Lamborghini), and was primarily responsible for the alleged sell-off." (Mot. at 20.) Plaintiff responds that it has alleged that the "Koifman Defendants sold their shares in deliberate breach of the lock-up agreement" and "based on the market value of the company stock." Thus, when these CUBV shares were sold by the Koifman Defendants, they were unjustly enriched. (Resp. at 21.)

The elements for a claim for unjust enrichment are "(1) a benefit conferred upon a

---

[5] Based on the conclusions reached herein by the Court, the Court need not address the Koifman Defendants' argument that none of the purportedly breached promises were made by or otherwise attributable to the Koifman Defendants.

defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1274 (11th Cir. 2009) (citing Rollins, Inc. v. Butland, 951 So.2d 860, 876 (Fla. Dist. Ct. App. 2006)); Della Ratta v. Della Ratta, 927 So.2d 1055, 1059 (Fla. Dist. Ct. App. 2006) (same).

Here, the unjust enrichment claim against Stock News arises from a quasi-contract to comply with the lock-up agreement. (First Am. Compl. ¶ 61.)  The Court disagrees with the Koifman Defendants that there are no allegations that Stock News received a benefit from the alleged violations of the lock-up agreement (see id.).  However, there is a pleading deficiency relative to the alleged agency relationship between Wilding and Stock News which is the basis for this claim. There are no allegations supporting an agency relationship between Wilding and Stock News that would support a finding of liability against Stock News.

Under Florida law, to demonstrate Wilding was the agent of Stock News, Plaintiff would have to allege: (1) acknowledgment by the principal that the agent will act for him; (2) the agent's acceptance of the undertaking and (3) control by the principal over the actions of the agent. Ocana v. Ford Motors Co., 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008) (citing Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla.1990)).  The allegations necessary for apparent agency are: (1) a representation by the purported principal; (2) reliance on that representation by a third party and (3) a change in position by the third party in reliance on the representation. Id. (citing Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 121 (Fla.1995)).  "[A]pparent authority exists only where the *principal* creates the appearance of an agency relationship."  Id. (emphasis in original; internal quotation marks omitted).  Noticeably lacking in the First Amended Complaint are any

16

allegations regarding representations made by the Koifman Defendants. The Court will, however, allow Plaintiff leave to amend to allege an agency or apparent agency relationship, assuming Plaintiff can do so in good faith.

Finally, because there are no allegations stating Koifman's acts were outside his corporate duties as opposed to taken on behalf of Stock News, the Court dismisses the unjust enrichment claim against Koifman for the same reason discussed for the dismissal of the breach of contract claim.

### 3. Money Had and Received

With respect to the money had an received claim, Stock News moves to dismiss, claiming that there are no allegations demonstrating that it had received or currently possesses any of Plaintiff's money. (Mot. at 21.) Plaintiff contends that, by virtue of Koifman's signature on the promissory notes, Stock News has acknowledged receipt of consideration worth no less than $16,666 and by selling shares in exchange for the promissory notes, Stock News reaped the benefits of this transaction without paying back the money from the promissory notes. (Resp. at 22.)

Stock News correctly notes that, under Florida law, the causes of action for money had and received, unjust enrichment, quasi-contract and restitution are often different names for the same remedy. See Equilease Corp. v. Hentz, 634 F.2d 850 (5th Cir.1981); Hall v. Humana Hosp. Daytona Beach, 686 So. 2d 653 (Fla. Dist. Ct. App. 1996); Ferguson v. Cotler, 382 So. 2d 1315 (Fla. Dist. Ct. App. 1980). Thus, applying the elements discussed supra for unjust enrichment claims, the Court finds that Plaintiff has properly stated a claim for money had and received since Plaintiff provided Stock News with the shares of stock in exchange for the payment evidenced by

the promissory notes which remain unpaid. (First Am. Compl. ¶ ¶ 65-67.)

However, the Court rejects Stock News' claim that Plaintiff cannot pursue both breach of contract as well as a claim for money had and received. At the pleading stage, Plaintiff is not precluded from pleading claims for both breach of contract and money had and received. See Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. Dist. Ct. App.1998) ("Until an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment on these grounds is premature."); see also Rule 8(d)(2) of the Federal Rules of Civil Procedure ("a party may set out 2 or more statements of a claim or defense alternatively or hypothetically"); Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009) citing Manicini Enterprises, Inc. v. American Exp. Co., 236 F.R.D. 695, 698-99 (S.D. Fla. 2006) (a plaintiff may plead inconsistent or alternative theories of relief). For these reasons, the Court denies Stock Fraud's motion to dismiss for failure to state a claim.

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss the First Amended Complaint with Prejudice (DE 17) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff shall file an amended complaint **within 14 days of the date of entry of this Order.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 28th day of February, 2012.

_____
KENNETH A. MARRA
United States District Judge